## Wells Fargo Bank, N.A. v. Okrah

288

C.P. of Lackawanna County No. 12 CV 3398

*Joel Ackerman* and *Brion W. Kelley*, for plaintiff.
*John P. O'Boyle*, for defendant.

NEALON, *J.*, January 8, 2014—The lender in this mortgage foreclosure action has presented a motion seeking to remove this matter from the Court of Common Pleas of Lackawanna County Residential Mortgage Foreclosure Diversion Program on the ground that the mortgaged property does not serve as the borrower's "primary residence," as required for eligibility for the diversion program. The parties' submissions reflect that the borrower resides at his Lackawanna County home for

more than three-quarters of the year, and only resides at his Bronx, New York, apartment for eighty-one days per year as an accommodation in connection with his part-time employment as a security officer for New York Yankees' home games at Yankee Stadium. Prior to his retirement in 2007, the borrower was employed as a municipal worker by the City of New York, and the fact that his municipal pension, credit union and tax statements indicate a Bronx apartment address does not alter the conclusion that his Lackawanna County property constitutes his "primary residence." Accordingly, the lender's motion seeking to remove this matter from the diversion program will be denied.

## I. FACTUAL BACKGROUND

On January 11, 2007, defendant, Edward Okrah ("Okrah"), purchased a residential property located at 213 Lake Scranton Road, Scranton, from Annette Levy for the sum of $190,800.00. (Lackawanna County Recorder of Deeds Instrument Number 200701331). In connection with that purchase, Okrah executed a note with HCI Mortgage, Lake Ariel, Pennsylvania, borrowing the sum of $189,287.00, and contemporaneously delivered a mortgage in that same amount to Mortgage Electronic Registration Systems, Inc. ("MERS"), Flint, Michigan, as nominee for HCI Mortgage. (Lackawanna County Recorder of Deeds Instrument Number 200701332). At the time that Okrah purchased the Lake Scranton Road property, he was employed as a municipal worker with the City of New York, but retired from that employment on September 28, 2007. (Docket entry no. 41 at p. 68 of 70; docket entry no. 42 at p. 2).

On June 25, 2008, Okrah executed a note with Access

National Mortgage, Reston, Virginia, in the principal sum of $192,126.00, and as security for payment of that debt, provided a mortgage in that amount to MERS, Ocala, Florida, as nominee for Access National Mortgage, on Okrah's property at 213 Lake Scranton Road. (Docket entry no. 1 at ¶¶ 3-4; docket entry no. 9 at ¶¶ 3-4). Okrah's mortgage with MERS dated June 25, 2008, indicates that the subject loan is insured by the Federal Housing Administration ("FHA"), and states that Okrah's Note with Access National Mortgage obligates him to make monthly mortgage payments from July 1, 2008, to July 1, 2038. (Docket entry no. 1, exhibit A at pp. 1-10). On August 12, 2008, MERS filed a "mortgage satisfaction piece" confirming that Okrah's earlier mortgage in conjunction with his HCI mortgage loan was fully paid and discharged on July 25, 2008. (Lackawanna County Recorder of Deeds Instrument Number 200820232).

To supplement his pension income, Okrah accepted part-time employment as a security officer for the New York Yankees' home games at Yankee Stadium in Bronx, New York. (Docket entry no. 43 at ¶ 3). The New York Yankees annually host eighty-one home games at Yankee Stadium during the regular season, and on those days that Okrah works as a security officer for those home games, he stays at an apartment that he rents in Bronx, New York. (*Id.* at ¶¶ 3-4). During the remainder of the year, Okrah resides at his 213 Lake Scranton Road property, which is the only real estate that he owns. (*Id.* at ¶¶ 2, 5).

Plaintiff, Wells Fargo Bank, N.A., ("Wells Fargo"), contends that Okrah's 2008 mortgage was later assigned by MERS to Wells Fargo pursuant to an assignment of mortgage that was recorded in the Office of the Recorder of Deeds for Lackawanna County on March 8, 2012.

(Docket entry no. 1 at ¶ 5). Alleging a failure by Okrah to make his monthly mortgage payment in December 2011, and based upon the acceleration of debt provisions contained in the mortgage agreement, Wells Fargo commenced this mortgage foreclosure action against Okrah on June 4, 2012, seeking to recover the aggregate sum of $192,806.66, representing the entire principal balance of $184,391.72, accrued interest of $6,649.48, escrow advances of $1,402.05, late charges of $348.41, and inspection fees of $15.00. (*Id.* at ¶¶ 6, 9). In its complaint, Wells Fargo specifically averred that Okrah resides at 213 Lake Scranton Road, Scranton, and Okrah admitted that residency averment in his responsive pleading. (Docket entry no. 1 at ¶ 2; docket entry no. 9 at ¶ 2).

In 2009, the Court of Common Pleas of Lackawanna County implemented its Residential Mortgage Foreclosure eiversion program ("the diversion program"). *See* Pennsylvania Bulletin, Vol. 39, No. 24, p. 2929 (June 13, 2009). In all residential mortgage foreclosure actions, the lender must furnish the borrower(s) with written notice of the existence of the diversion program and the steps to be taken by the borrower(s) to participate in a court-supervised conciliation conference with the lender in an attempt to settle the mortgage foreclosure litigation. *See* Lacka. Co. R.C.P. Nos. 205.2(b), 1034(b)-(d), 1035.2(b)-(d), 1143(a), 3129.1(c). If the borrower opts into the diversion program by submitting a written request for a conciliation conference to the Lackawanna County Court Administrator, and preparing the financial worksheet prescribed by the local rules, the court administrator is required to issue a case management order scheduling the matter for the next available conciliation conference

list.[1] *See* Lacka. Co. R.C.P. Nos. 1034(c)-(d), 1035.2(c)-(d), 1143(b)-(c), 1143.1(b)-(c), 3129.1(c), Forms 9, 10, 14. The mortgage foreclosure proceedings are stayed for a minimum period of sixty days or until the matter is removed from the diversion program, whichever is later. *See* Lacka. Co. R.C.P. Nos. 1034(b), 1035.2(b), 1143(d), 3129.1(e).

The local rules governing the diversion program clearly state that the diversion program applies only to mortgage foreclosure actions involving "a residential property which serves as the primary residence" of the borrower(s). *See* Lacka. Co. R.C.P. Nos. 1143(a), 3129.1(c). The written notices which must be provided to the borrower(s) by the lender likewise state that "[i]f you own and live in the residential property which is the subject of this foreclosure action, you may be able to participate in a court-supervised conciliation conference in an effort to resolve this matter with your lender." Lacka. Co. R.C.P. Nos. 205.2(b), 1034(b), 1035.2(b), 1143(a), 3129.1(c), Forms 8, 11, 12. Similarly, the "request for conciliation conference" form that borrowers must submit to the court administrator contains an express certification by the borrower that [s]he "lives in the subject property which is

---

1. As per the local rules and required written notices, if the borrower is not represented by counsel, [s]he must contact and meet with a housing counselor from Neighbor Works Northeastern Pennsylvania or the United Neighborhood Centers of Northeastern Pennsylvania within a specified period of time in order to complete the financial worksheet to be furnished to the lender. *See* Lacka. Co. R.C.P. No. 1143.1(b), Forms 8, 11-12. However, "[i]f the defendant/borrower is represented by counsel, the defendant/borrower need not contact and meet with one of the identified housing counselors as a condition precedent to requesting a conciliation conference, provided that counsel for the defendant/borrower completes the prescribed financial worksheet (Form No. 14), and files the Request for Conciliation Conference form within the time deadlines set forth in the applicable notice." *Id.*

[borrower's] primary residence." *Id.*, Form 9 at ¶ 2.

On October 1, 2012, Okrah submitted a completed financial worksheet and filed a request for a conciliation conference, and on that same date, the court administrator issued a case management order scheduling this matter for a conciliation conference on November 30, 2012. (Docket entry nos. 10-11). At that initial conference, Wells Fargo indicated that although Okrah had previously submitted requested financial information and records, Wells Fargo needed updated financial materials in order to consider Okrah's request for a loan modification. (Transcript of Proceedings ("T.P.") on 11/30/12 at pp. 2-3). Therefore, an order was entered on December 4, 2012, directing Okrah to provide Wells Fargo "with a complete financial packet" within ten days, and scheduling this case for another conciliation conference on January 25, 2013. (Docket entry no. 13).

On January 10, 2013, Megan Meese of the Loss Mitigation/Mediation Department of Wells Fargo's counsel, Zucker, Goldberg & Ackerman, LLC, provided the undersigned with a written status report from Joel Ackerman, Esquire, of the Zucker firm. (Docket entry no. 33). In that report, Wells Fargo acknowledged that Okrah had "submitted the required documents in a timely manner and as a result, [his] file was sent to an underwriter for further review on December 19, 2012." (*Id* at p. 1). Wells Fargo reported that the underwriter was "now in need of" certain additional materials, including a signed letter of explanation by Okrah verifying that the Lake Scranton Road "property is owner-occupied" since Okrah's income, pension and savings account statements reflected his Bronx apartment address. (*Id*). During the ensuing conciliation conference on January 25, 2013,

Wells Fargo confirmed that it had been furnished with the requested supplemental information, but stated that the underwriter needed an additional forty-five days to review those materials and make a determination concerning Okrah's loan modification request. (T.P. 1/25/13 at p. 2). Consequently, by order dated January 25, 2013, a conciliation conference was scheduled for March 15, 2013. (Docket entry no. 15).

On March 6, 2013, Megan Meese of the Zucker firm forwarded an email to the undersigned and Okrah's counsel requesting a continuance of the conciliation conference scheduled for March 15, 2013. Ms. Meese stated that Wells Fargo was "making this request so that [Okrah] can be decisioned based on the new FHA waterfall guidelines." (Docket entry no. 34). Without objection by Okrah, the conciliation conference was postponed to April 19, 2013. (Docket entry no. 16).

In anticipation of that rescheduled conference, Ms. Meese forwarded a status report authored by Attorney Ackerman of the Zucker firm on April 11, 2013. In that report, Wells Fargo "stated that the documents on file have become expired and others will be expiring in the next two weeks." (Docket entry no. 35 at p. 1). The status report identified various updated documents that Wells Fargo was "now in need of...for the review to proceed with the underwriter towards a decision." (*Id.*). At the time of the conciliation conference on April 19, 2013, Wells Fargo confirmed that the additional requested items had been produced by Okrah, and Wells Fargo represented that Wells Fargo and the underwriter would need forty-five days to review the supplemental information and reach a decision regarding a loan modification for Okrah. (T.P. 4/19/13 at pp. 2-3). Thus, this matter was scheduled for

another conciliation conference on June 14, 2013. (Docket entry no. 20).

On May 31, 2013, Janene Rimolo of the "PA Conciliation and Loss Mitigation Department" of the Zucker firm forwarded a status report that was authored by Attorney Ackerman. (Docket entry no. 36). Wells Fargo claimed in its report that it had "not been able to render a decision on the request for modification at this time due to lack of sufficient documents" it had requested from Okrah on May 17, 2013. (Id at p. 2). After Okrah's counsel furnished proof that the requested materials had already been forwarded to Megan Meese of the Zucker firm, Ms. Rimolo stated that the Zucker firm would "get this straightened out ASAP" by hopefully "accessing Megan's emails as she is no longer with the firm." (*Id* at pp. 4, 6). By email dated June 5, 2013, Ms. Rimolo confirmed that the Zucker firm had, in fact, received the requested documents and were in the process of forwarding them "to the servicer for review today." (Docket entry no. 37).

During the subsequent conciliation conference on June 14, 2013, Wells Fargo represented that the only remaining items that Wells Fargo and the underwriter needed to complete their review and make a determination were a new 4506-T form and a revised Request for Mortgage Assistance ("RMA") form from Okrah. (T.P. 6/14/13 at p. 2). Counsel for Wells Fargo and Okrah both confirmed at that conference that Okrah had just completed the new 4506-T and RMA forms and was furnishing them to Wells Fargo on that date. (*Id.* at pp. 3-4). As a result, an order was issued on June 18, 2013, scheduling another conciliation conference for August 23, 2013, and directing Wells Fargo to "make a decision regarding the borrower's request for a loan modification agreement and [to] communicate that

decision to [Wells Fargo's] counsel and [Okrah's] housing counselor and counsel" by no later than August 9, 2013. (Docket entry no. 25).

On June 26, 2013, FeMichelle Bautista of the "PA Mediation Team" at the Zucker firm forwarded an email to the undersigned and Okrah's counsel requesting "clarification if borrower has a [household] contributor," and if so, to furnish various financial records pertaining to that contributor. (Docket entry no. 38). In an email communication dated July 5, 2013, FeMichelle Bautista of the Zucker firm "acknowledged receipt of financial documents" from Okrah's counsel on June 28, 2013, and stated that those materials were "forwarded to [Wells Fargo] to continue with a loan modification review." (Docket entry no. 39). On August 19, 2013, Attorney Ackerman of the Zucker firm submitted a status report indicating that Wells Fargo needed more information and documentation with respect to Okrah's household contributor, his son, Kwaku Okrah. (Docket entry no. 40).

At the time of the conciliation conference on August 28, 2013, Wells Fargo confirmed that it had been provided with the supplemental information and records which had been requested relative to Okrah's son and household contributor. (T.P. 8/28/13 at pp. 2-3). Noting the extensive history of serial requests for information and documentation by Wells Fargo and its underwriter, the undersigned expressed his firm desire "to ensure that everything that they need, not only from the borrower but also from the contributor, they now have...and that nothing will be stale by the time that we return for another, final conference." (*Id.* at pp. 3-4). Therefore, an order was entered which (1) required Wells Fargo to confirm in writing by August 30, 2013, "that it has all

financial records and information necessary to make a loan modification decision," (2) directed Wells Fargo to make and communicate "a decision regarding [Okrah's] request for a loan modification agreement" by no later than October 11, 2013, and (3) scheduled a final conciliation conference for October 25, 2013. (Docket entry no. 28).

During the final conciliation conference on October 25, 2013, Wells Fargo represented that it was denying Okrah's request for a loan modification because his Lake Scranton Road property does not serve as his principal residence, and Okrah has "an FHA loan which requires owner-occupied status in order to be modified." (T.P. 10/25/13 at pp. 2, 4). Wells Fargo premised that conclusion upon Okrah's pension benefit statements, tax returns and paystubs reflecting his Bronx apartment addresses. (*Id.* at pp. 4-5). Okrah's counsel replied that Okrah only resides at his current Bronx apartment eighty-one days per year while working security at the New York Yankees home games, and permanently resides at the Lake Scranton Road address during the remainder of the year. (*Id.* at pp. 5-6, 14). Since the diversion program likewise requires the mortgaged property to serve as the borrower's "primary residence," Wells Fargo presented an oral motion to remove this matter from the diversion program so that the mortgage foreclosure litigation could proceed. (*Id.* at pp. 17-18).

On October 28, 2013, the parties were directed to submit testimonial and documentary proof of Okrah's primary residency so that a determination could be made regarding his eligibility for the diversion program. (Docket entry no. 29). By order dated October 30, 2013, Wells Fargo was also directed to "submit to the undersigned for an *in camera* review the credit report that [Wells Fargo]

obtained in attempting to verify [Okrah's] occupancy of the subject property in compliance with chapter II, section 5.3 of the Making Home Affordable Program Handbook for Servicers." (Docket entry no. 30). Wells Fargo and Okrah submitted their residency proof on a timely basis, (Docket entry nos. 41-42), and Okrah later supplemented his submissions on November 15, 2013, by filing a verified "Affidavit of residence." (Docket entry no. 43).

Wells Fargo's residency evidence consists of Okrah's tax returns, W-2 forms, New York City Employees' Retirement Benefits statements, New York City Municipal Credit Unit statements, and Apple Bank savings account statement reflecting two Bronx apartment addresses for Okrah: Apt. 61, 1840 Grand Concourse, Bronx, in 2011; and Apt. 36C, 20 West Mosholu Parkway South, Bronx, in 2012. (Docket entry no. 41). In addition to his affidavit attesting that he resides in Scranton two hundred eighty-four (284) days per year and in Bronx, NY, eighty-one (81) days per year, (Docket entry no. 43), Okrah has submitted various utility bills documenting his residence as 213 Lake Scranton Road, together with proof that the only driver's license that he possesses is a Pennsylvania driver's license. (Docket entry no. 42). Okrah has also filed chapter 4, section B of HUD 4155.1 setting forth the definition of "principal residence" contained in FHA guidelines. (Docket entry no. 44 at p. 4-B-5). Upon the submission of those materials, Wells Fargo's motion became ripe for disposition.

## II. DISCUSSION

### (A) INTRODUCTION

To be eligible to participate in the diversion program, Okrah's property at 213 Lake Scranton Road must serve

as his "primary residence." The local rules governing the diversion program do not define the phrase "primary residence," nor has the Court of Common Pleas of Lackawanna County had occasion to construe those words in the context of the diversion program. As a result, we must resort to well-settled rules of construction in interpreting the "primary residence" requirement for the diversion program.

Lackawanna County Rules of Civil Procedure Nos. 127 and 128 mirror Pennsylvania Rules of Civil Procedures Nos. 127 and 128 in addressing the construction of procedural rules and the application of certain presumption in ascertaining the intent of the court which adopted the rule in question. Pa.R.C.P. 127(a) and Lacka. Co. R.C.P. 127(a) both state that the primary object "of all interpretation and construction" of the statewide rules and the local rules "is to ascertain and effectuate the intention" of the entity which promulgated the rule. *See Newman Development Group of Pottstown. LLC v. Genuardi's Family Markets. Inc.*, 52 A.3d 1233, 1246 (Pa. 2012). Pa.R.C.P. 127(c) and Lacka. Co. R.C.P. 127(c) also provide that when the words of a rule are not clear and free from all ambiguity, the intention of the court adopting the rule may be ascertained by considering: (1) the occasion and necessity for the rule; (2) the circumstances under which it was promulgated; (3) the mischief to be remedied and the object to be attained; (4) the prior practice, including other rules and statutes, upon the same or similar subjects; (5) the consequences of a particular interpretation; (6) the history of the rule; and (7) the practice followed under the rule. Pa.R.C.P. 127(c)(1)-(8); Lacka. Co. R.C.P. 127(c)(1)-(7). *See also Touloumes v. E. S. C. Incorporated*, 587 Pa. 287, 292-293, 899 A.2d 343, 346 (2006). Additionally, it is presumed

that the court which enacted the rule did not intend a result that is absurd or unreasonable, and also aimed to favor the public interest as against any private interest. *See* Pa.R.C.P. 128(a), (e); Lacka. Co. R.C.P. 128(a), (e).

(B) PURPOSE AND INTENT OF DIVERSION PROGRAM

On September 8, 2010, Chief Justice Ronald D. Castille directed the president judges of county courts to consider creating mortgage foreclosure diversion programs "to effectively deal with the large numbers of foreclosure filings relating to single family residential properties, and to present a means by which these cases could be worked out by mutual agreement of the parties, when possible." Samuel W. Milkes, *"Mortgage Foreclosure Diversion Programs: An Aid to Homeowners and Lenders — A Case Management Tool for Courts,"* 83 Pa.B.A.Q. 93, 94 (July 2002). The accompanying announcement issued by the administrative office of the Pennsylvania Courts stated that mortgage foreclosure mediation programs assist in "saving families' homes and helping lenders avoid the need to foreclose and take possession of property." *Id.* The mortgage foreclosure "diversion programs are intended to offer opportunities for residential, owner-occupied properties." *Id.* at 95. *See also* C. Darnell Jones II, *"The Media and a 'Dependent' Judiciary,"* 48 Duq. L. Rev. 851, 853 (Fall 2010) (stating that the Residential Mortgage Foreclosure Diversion Pilot Program in Philadelphia County was established "to provide court intervention in residential, owner-occupied mortgage foreclosure cases.").

The undersigned was charged with the task of developing, implementing and presiding over the Lackawanna

County diversion program which has been in operation since 2009. In that capacity, the undersigned has previously noted that our diversion program is designed to serve the dual purpose of keeping homeowners and their families in their homes while transforming nonperforming loans into performing loans again under terms that homeowners can realistically afford. *See* James Haggerty, *Court hopes to cut rising foreclosures*, The Times-Tribune, February 28, 2009, A1; Dan Miller, *Cumberland County judge wants to start foreclosure mediation program*, The Patriot-News, July 28, 2011, A4. To that end, the diversion program includes the requirement that the property in question be owner-occupied and serve as the borrower's primary residence. *See* Lacka. Co. R.C.P. Nos. 1143(a), 3129.1(c). The intent of that requirement is to make commercial properties, vacation homes, rental-income producing properties, and other properties that are not owner-occupied ineligible for the diversion program. *See also Milkes*, 83 Pa.B.A.Q. at 95.

(C) INTERPRETATION OF "PRIMARY RESIDENCE" REQUIREMENT

The phrase "primary residence" is not defined by any Pennsylvania statute, rule or case law relating to housing or mortgages. *Cf. In re Residence Hearing Before Bd. of School Directors. Cumberland Valley Sch. Dist. (Thane)*, 560 Pa. 366, 370, 744 A.2d 1272, 1274 (2000) (noting that the Public School Code of 1949, 24 P.S. § 130.1302, uses "the term 'resides' rather than terms such as 'has a primary residence' or 'is domiciled' in the school district."). But at least one Pennsylvania statute addressing primary residency in another context, and several federal regulations, indicate that the most important criterion in defining a person's "primary residence" is where [s]he

resides for the majority of the year. Section 318 of the Low-Level Radioactive Waste Disposal Act, 35 P.S. § 7130.318, provides that the operator of a low-level waste disposal facility shall pay to the host municipality "a reasonable surcharge on rates charged for waste disposed" at that facility, which is to be used, *inter alia*, for the "[p]ayment of school district and municipal property taxes for individuals whose primary residence is within two miles" of that facility. 35 P.S. § 7130.318(f)(4). That provision further states that "a primary residence is the property in which the owner resides for at least nine months of each year." *Id.*

Although the phrase "primary residence" is defined somewhat differently "in the code of federal regulations depending on the agency interpreting this term,...all appear to have the common theme that an individual must reside at the residence for a substantial portion of the year." *United States v. Real Property Located at 6415 North Harrison Avenue. Fresno, CA*, 2011 WL 4433157, at * 3 (E.D. Cal. 2011). In connection with its Hope for Homeowners Program that has been established within the Federal Housing Administration, the Department of Housing and Urban Development ("HUD") defines "primary residence" as meaning "the dwelling where the mortgagor maintains his or her permanent place of abode and typically spends the majority of the calendar year." 24 C.F.R. § 257.7. Under its federal disaster assistance program, the Federal Emergency Management Agency (FEMA) has defined "primary residence" as "the dwelling where the applicant normally lives during the major portion of the calendar year." 44 C.F.R. § 206.111. *See also United States v. Breland*, 366 Fed. Appx. 548, 549, 553, 2010 WL 610236, at * 2, 4 (5th Cir. 2010) (FEMA representative

testified that the Code of Federal Regulations defines "primary residence" as "where a person resides for the majority of the year."). Additionally, the National Park Service regulations state that a "[c]laimant means a person who has occupied and used a cabin or other structure as a primary, permanent residence for a substantial portion of the time, and who, when absent, has the intention of returning to it as his/her primary, permanent residence." 36 C.F.R. § 13.104.

In insurance coverage litigation, other jurisdictions have likewise concluded that in determining an individual's primary residence, "[w]here a person spends the majority of his time is the most important factor." *State Farm Fire and Casualty Company v. Lange*, 2011 WL 149482, at * 5 (S.D. Tex. 2011). In *Bonich v. State Farm Mutual Automobile Insurance Company*, 996 So. 2d 942 (Fla. Dist. Ct. App. 2008), the court noted that "[t] he State Farm policy provides coverage only to relatives who are residing *primarily* with the named insured," and reasoned that "coverage turns on the quantity of time that the relative actually resides with the named insured." Id at 945 (emphasis in original). The Louisiana appellate court in *Haydel v. State Farm Insurance Company*, 935 So. 2d 171 (La. Ct. App. 2006), *writ denied*, 937 So. 2d 385 (La. 2006), granted summary judgment to a father's insurer after finding "that no genuine issue of material fact existed as to where [son] 'primarily' resided" since the evidence established that the son "not only resided with his mother for 'most' of the school year, but also that overall [son] spent about '70 percent' of his time in his mother's household." *Id* at 174. Accord *Jenks v. State Farm Mutual Insurance Company*, 2005 WL 602560, at * 2 (Mich. Ct. App. 2005) (denying coverage to plaintiff

under mother's policy since "reasonable minds could not differ in concluding that plaintiff did not reside there 'primarily' when he spent the majority of his time living in his father's house."), *app. denied*, 474 Mich. 905, 705 N.W.2d 114 (Mich. 2005).

Okrah has also submitted a HUD publication which provides information to homeowners concerning FHA-insured mortgages. Chapter 4, section B of HUD 4155.1 sets forth the "Eligibility Requirements for Principal Residences," and defines the comparable phrase "principal residence" as "a property that will be occupied by the borrower for the majority of the calendar year." U.S. Department of Housing and Urban Development, HUD 4155.1, Mortgage Credit Analysis for Mortgage Insurance, 4.B.2.a, http://www.hud.gov/offices/adm/ hudclips/handbooks/hsgh/4155.1/41551HSGH.pdf. (filed as docket entry no. 44). A separate publication addressing eligibility for the Home Affordable Modification Program ("HAMP") Tier 1, which also requires that "[t]he mortgage loan is secured by a single family property that is occupied by the borrower as his or her principal residence," states that the servicer may verify such occupancy by obtaining "a credit report...to confirm whether the property securing the mortgage loan is the borrower's principal residence." Making Home Affordable Program Handbook for Services of Non-GSE Mortgages, 71, 104 (Sept. 16, 2013), http://www.makinghomeaffordable. gov/for-partners/understanding-guidelines/Documents/ mhahandbook 43.pdf (filed as docket entry no. 45). In the case sub judice, Wells Fargo did secure such a credit report regarding Okrah, and that credit report identifies Okrah's principal residence address as 213 Lake Scranton Road, Scranton, PA 18505. (Docket entry no. 46).

The parties' submissions reflect that Okrah resides at his Scranton residence for more than three-quarters of the year. The Lake Scranton Road property, which Okrah purchased seven years ago, is the only real estate that Okrah owns. Okrah does not own an apartment in New York, and instead has merely rented different apartments in the Bronx in 2011-2012 and 2012-2013. *See Lange, supra,* at * 5 (a relevant factor in determining a person's "primary residence" is whether [s]he owns or simply rents the property).

The available record establishes that Okrah maintains a Bronx apartment solely for the purpose of having a place to stay for eighty-one days per year while he performs security work at Yankee Stadium. It is understandable that Okrah's municipal pension and credit union statements indicate a Bronx apartment address since those funds were generated prior to his 2007 retirement and relocation to Scranton. Moreover, his most recent Apple Bank Savings statement reflects a balance of $7.55, which is being held in trust for his son, Kwaku Okrah, and does not warrant a finding of primary residency in New York. Finally, the credit report obtained by Wells Fargo confirmed that Okrah's Scranton property is his principal residence. Hence, the totality of the circumstances demonstrates that Okrah's Lake Scranton Road property functions as his principal or primary residence.

The "primary residence" requirement for our diversion program is designed to exclude commercial real estate, vacation homes, rental properties, and non-owner occupied residences from the diversion program. Court-supervised resolution of mortgage disputes involving those types of properties will not serve the diversion program's goal of keeping homeowners and their families in their homes.

Based upon the evidence submitted, Okrah's Lake Scranton Road property constitutes his "primary residence" under the diversion program. The denial of Wells Fargo's motion to remove this matter from the diversion program will fulfill the program's primary purpose by seeking to keep Okrah and his son in their principal residence. Thus, Wells Fargo's motion to remove will be denied.

The prior conciliation conferences in this case were plagued by Wells Fargo's belated demands for supplemental financial information, Wells Fargo's continuance requests to afford it and the underwriter additional time to review those documents, subsequent assertions by Wells Fargo that financial materials furnished by Okrah had become stale and needed to be updated, and delay occasioned by Wells Fargo's misplacement of those records after they were provided by Okrah. During these periods of delay, interest, penalties and fees have continued to accrue, thereby hindering the parties' ability to negotiate an affordable and mutually acceptable loan modification agreement. This cycle of demands by lenders for additional information from borrowers, lenders' applications for continuances to review those materials, and lenders' ensuing claims that financial records have become outdated following those postponements, is an all too common occurrence in conciliation conferences involving servicers, investors and third parties other than the original lenders who loaned money to the borrowers when they first purchased their homes.

To insure that the next conciliation conference in this matter is not another fruitless exercise, Wells Fargo will be directed to advise Okrah in writing within the next fifteen (15) days what additional or updated financial information and documents are needed to consider Okrah's request

for a loan modification. Okrah will be required to furnish those materials to Wells Fargo within thirty (30) days thereafter, and a conciliation conference will be conducted on Friday, March 28, 2014, at 10:00 AM. In addition, pursuant to Lacka. Co. R.C.P. 1143.1(e), duly authorized representatives of Wells Fargo and the underwriter must attend the conciliation conference in person with authority to negotiate a loan modification agreement. An appropriate order follows.

## ORDER

And now, this 8th day of January, 2014, upon consideration of the motion of plaintiff, Wells Fargo Bank, N.A., to remove this matter from the Court of Common Pleas of Lackawanna County Residential Mortgage Foreclosure Diversion Program, and the exhibits and legal argument presented by the parties, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

1. Plaintiff's motion to remove this case from the Court of Common Pleas of Lackawanna County Residential Mortgage Foreclosure Diversion Program is denied;

2. Within the next fifteen (15) days, plaintiff shall advise defendant as to what financial information and documents are needed in order for plaintiff and the underwriter to consider defendant's request for loan modification;

3. Within thirty (30) days of receiving that information and documents request from plaintiff, defendant shall furnish the requested information and materials to plaintiff;

4. Another Conciliation Conference will be conducted on Friday, March 28, 2014, at 10:00 AM in the Jury Assembly Room, 1st Floor, Lackawanna County

308

Courthouse. Pursuant to Lacka. Co. R.C.P. 1143.1(e), duly authorized representatives of plaintiff and the underwriter must attend the conciliation conference in person with authority to negotiate a loan modification agreement; and

5. By no later than March 14, 2014, counsel for the plaintiff shall provide the undersigned, opposing counsel and the assigned housing counselor with a written status report of the parties' loan modification negotiations.